1

2

3

4                                                         **E-FILED on      10/9/07**

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12   RICHARD B. FOX, M.D.,                    No. C-04-00874 RMW

13              Plaintiff,

14        v.                                  ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANTS'
15   GOOD SAMARITAN HOSPITAL and GOOD         MOTION FOR SUMMARY JUDGMENT
     SAMARITAN HOSPITAL MEDICAL
16   STAFF,                                   **[Re Docket Nos. 87 and 129]**

17              Defendants.

18

19

20        Defendants Good Samaritan Hospital and Good Samaritan Hospital Medical Staff move for

21   summary judgment on all of the remaining claims for relief in the complaint of plaintiff Richard B.

22   Fox, M.D., which alleges antitrust and related state claims. The court previously granted judgment

23   on the pleadings as to Count III seeking relief for alleged unreasonable restraint of trade based on an

24   exclusive contract. The court has read the moving and responding papers, considered defendants'

25   accompanying objections to plaintiff's evidence[1] and heard the arguments of counsel. For the

26   _____

27   [1] Evidence has been cited only if the court considered it admissible. However, statements or
     evidentiary rulings made in this order do not constitute issues deemed established for purposes of
28   trial, except those in the section headed "III. ORDER." *See* Civil L.R. 56-3.

reasons set forth below, the court grants defendants' motion as to Counts I and II and denies it a to Counts IV, VI and VII.

## I. BACKGROUND

Plaintiff is a physician in private practice in San Jose, California, certified in pediatric pulmonology and pediatric critical care medicine. He has been a member of the Medical Staff of Good Samaritan Hospital ("Good Samaritan" or "Hospital") since 1989, assigned to the Department of Pediatrics. Plaintiff's appointment at Good Samaritan is subject to a two-year review cycle. The Good Samaritan Hospital is a private, for-profit hospital, located in San Jose.

Plaintiff's medical practice emphasized critical care for pediatric patients and treatment of pediatric patients with pulmonary disorders or diseases. Possessing hospital privileges to admit pediatric patients to an intensive care unit ("ICU") is critical to this practice. Initially, Good Samaritan granted plaintiff the "Pediatric Critical Care Without Consultation in the ICU" ("PICU") privilege and the "Pediatric Ventilator Management" ("PVM") privilege. These privileges allowed plaintiff to admit critical care patients into the ICU and to treat pediatric patients with respiratory disorders by using a ventilator, a mechanical device available only in an ICU.

In 1997 Good Samaritan instituted a more stringent policy regarding pediatric ICU privileges. This policy required physicians to arrange alternate care coverage in order to obtain or renew their PICU privileges. When a member of Good Samaritan's Medical Staff is unavailable, the member must assure that the treatment of his or her patients in the Hospital is supervised by a qualified physician. Plaintiff had previously designated Dr. Marjorie McCracken and Dr. Anders Dahlstrom as his alternate call coverage. Their privileges, however, were insufficient to satisfy this new coverage policy because they were not the same privileges as held by plaintiff. Plaintiff alleges that his biennial reappointment was withheld in March 1998 for failure to designate appropriate alternate care coverage, but that his privileges were temporarily continued while the Medical Staff considered the matter.

In April 1999, Good Samaritan's Medical Staff Executive Committee, on recommendation of the Credentials Committee and the Department of Pediatrics, amended the alternative call coverage requirements for the Pediatrics Department and required any physician designated to provide

alternate call coverage for pediatric ICU care without consultation and ventilator care was required to have PICU and PVM privileges.  Any member holding the PICU or PVM privileges had to designate this alternate call coverage.  This requirement is referred to as the "identical privileges rule."  Upon receiving notice of the new identical privileges rule, plaintiff requested and was supplied a list of all members of the Good Samaritan Department of Pediatrics who possessed identical privileges, namely both the PICU and PVM privileges.

On April 28, 1999, the Hospital's Board of Trustees approved the recommendation of the Medical Staff requiring that alternative call coverage physicians have identical privileges as the primary care physician.  Affected physicians were notified on April 29, 1999 that if a physician did not provide alternate call coverage with identical privileges within thirty days, the Hospital would administratively suspend his or her affected privileges.  At the end of the thirty day period, plaintiff declined to designate alternate call providers with identical privileges, continuing instead to insist on Drs. McCracken and Dahlstrom as his alternate call providers.  Consequently, on June 2, 1999, Good Samaritan notified plaintiff that his PICU and PVM privileges were administratively suspended "until such time as documentation of call coverage by providers with identical privileges has been provided or a written request for waiver by the Staff Executive Committee has been approved." Compl., Ex. 27.  Dr. Fox remained on the Good Samaritan Medical Staff but without PICU and PVM privileges; no action was taken against any other privileges he then held.  No one questioned Dr. Fox's personal competence or qualifications.

Dr. Fox responded to the suspension of his privileges by pursuing challenges to the identical privileges rule.  On June 22, 1999, he wrote a letter to the Chief of the Medical Staff questioning the wisdom and fairness of the new rule and requesting an adjudicatory hearing.  His request for an adjudicatory hearing was declined.  However, the Hospital permitted plaintiff to appear before the Medical Staff Executive Committee, which he did on November 12, 1999, to challenge the alleged discriminatory nature of the rule, since it applied only to members of the Department of Pediatrics. His challenge was unsuccessful.

In September 1999, Dr. Fox notified Good Samaritan's Department of Pediatrics that he was discontinuing his pediatric critical care and pediatric pulmonary service at the Hospital and that he had relocated his practice to Los Gatos Community Hospital.

In October 1999 Good Samaritan contracted with Northern California PICU Associates to provide on-call 24 hours per day pediatric critical care services at Good Samaritan. The contract was non-exclusive and the Chief of Staff at Good Samaritan had advised Dr. McConnell, the group's principal, that he expected the group to provide alternate call coverage for Dr. Fox if he requested it. Dr. McConnell agreed but Dr. Fox never asked.

After addressing the Medical Staff Executive Committee, plaintiff was subsequently allowed to challenge the rule before Good Samaritan's Board of Trustees and did so on April 26, 2000. The Board of Trustees unanimously agreed with the Medical Staff Executive Committee, and found that "the rules regarding coverage further the interests of patient care and have been appropriately applied in [plaintiff's] case." Compl., Ex. 65.

In October 2001, Dr. Fox petitioned the state superior court for a writ of mandate. In his amended petition, he asked that the court direct the Hospital to set aside the suspension of his PICU and PVM privileges and reconsider its determination in light of a fair procedure. In his petition he asserted that he was entitled under the Hospital's by-laws to an adjudicatory hearing. He also complained that "the validity of the suspension of [his] pediatric critical care privileges was prejudiced by [the Hospital's] simultaneous negotiations for an exclusive coverage contract for pediatric critical care services with another group of physicians at an affiliated hospital." Def.'s RFJN , Ex. A. The superior court held that plaintiff was not entitled to a judicial review hearing and that "the alternate call coverage rule is rationally related to improving patient care, and is not arbitrary and capricious." *Fox v. Good Samaritan Hosp.*, No. CV802341 (Cal. Superior Court February 28, 2002). The decision was affirmed on appeal, and the court of appeal stated, among other things, that the "Hospital's alternate call coverage rule was based upon 'professional criteria' and was 'uniformly applied to all medical staff applicants and members.'" *Fox v. Good Samaritan Hosp.*, 2003 WL 21675515 * 5 (Cal. Ct. App. July 18, 2003).

In March 2002 plaintiff re-applied for PVM and PICU privileges. Good Samaritan continued to deny his applications for failure to comply with the identical privileges coverage rule. In his March 1, 2002 application for the privileges, he designated for alternate coverage (1) Dr. McCracken, who had finally been granted PVM and PICU privileges, (2) Dr. Dahlstrom, who did not have PVM privileges but later applied for them on May 10, 2002, and (3) Dr. Singleton, who had PVM privileges in the Anesthesiology Department and applied for the same privileges in the Pediatrics Department in August 2002. Dr. Fox contends that his designation of these physicians in his March 2002 application more than satisfied the identical privileges coverage rule. On March 20, 2003, because no action had been taken on his March 2002 application, Dr. Fox filed another petition for a writ of mandate seeking PICU Admitting privileges. That petition was withdrawn on November 4, 2003 as Good Samaritan restored Dr. Fox's PICU privilege in September 2003.

In January 2004, Dr. Fox submitted his biennial reappointment application to Good Samaritan seeking both PICU and PVM privileges. He designated two pediatric anaesthesiologists on the Hospital's medical staff, Dr. Singleton and Dr. Mendoza, as alternate call coverage for the PVM privilege. Dr. Singleton had been granted such privilege; Dr. Mendoza had not been but Dr. Fox believed him highly experienced in pediatric ventilator management. On April 27, 2004,[2] Dr. Fox filed another petition for a writ of mandate in the state superior court. On May 17, 2004 the Hospital's CEO, William Piche′, advised Dr. Fox that his privileges were approved except that "his request for Ventilator care was deferred pending your provision of appropriate alternate call coverage." Def.'s RFJN., Ex. C-4. An amended writ petition was filed on October 20, 2004 seeking an order that the Hospital grant Dr. Fox the PVM privilege on the basis that alternate call coverage had been provided. On January 27, 2005 the superior court denied the petition holding that the alternate coverage rule had previously been held to not be arbitrary, capricious or discriminatory and that petitioner had failed to demonstrate "the physicians he designated satisfy the rule." *Fox v. Good Samaritan Hosp.*, No. 1-04-CV-026778 (Cal. Superior Court. Jan. 27, 2005). Judgment was entered

_____

[2] The record is not clear as to the actual date of filing of the petition.

1  on February 18, 2005.  Dr. Fox appealed but he dismissed the appeal on August 16, 2005 "due to

2  mootness."  Def.'s RFJN F.

3       On March 4, 2004 Dr. Fox, proceeding *pro se*, filed his complaint in this court against

4  defendants alleging antitrust violations under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 &

5  2, violations under the Health Care Quality Improvement Act, 42 U.S.C. § 11101, and state causes

6  of action for withholding hospital privileges in violation of public policy, Cal. Bus. & Prof. Code

7  §§ 510-512, 2056, and breach of the implied covenant of good faith and fair dealing.  The court

8  granted Good Samaritan's motion for judgment on the pleadings as to plaintiff's claim for relief for

9  unreasonable restraint of trade in violation of an exclusive contract, but denied the motion as to

10  plaintiff's other causes of action.

11       Plaintiff retained counsel in April 2005.  The court by recent order has allowed plaintiff to

12  substitute Good Samaritan Hospital LP and Good Samaritan Hospital LLC for Good Samaritan

13  Hospital and to add HCA Inc. as a defendant, and add a state cause of action for interference with

14  prospective economic relations.  The court otherwise denied plaintiff's motion to amend his

15  complaint which sought to add claims under the Racketeer Influenced and Corrupt Organizations

16  Act, 18 U.S.C. §§ 1961-1968 and a state law defamation claim.

17       Good Samaritan moved for summary judgment on plaintiff's remaining claims for relief in

18  his original complaint.  A jury trial was originally set for May 2007 but has been continued to allow

19  the court more time to address the summary judgment motion.

20                        **II.  ANALYSIS**

21       **A.  Summary Judgment Standard**

22       The essential question in this case is whether the denial of Dr. Fox's PICU and PVM

23  privileges resulted from a stubborn and unreasonable refusal by Dr. Fox to obtain appropriate

24  alternate call coverage pursuant to Good Samaritan's requirement of identical privileges coverage, a

25  requirement that has been determined to be rationally related to improving patient care, or whether

26  the denial resulted from anticompetitive actions taken by defendants to exclude Dr. Fox from

27  providing competitive pediatric intensive and ventilator care.  The question on this motion, however,

28  is only whether Dr. Fox has raised a triable issue of material fact on any of his claims.

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* A party moving for summary judgment who does not have the ultimate burden of persuasion at trial has the initial burden of producing evidence negating an essential element of the non-moving party's claims or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In overturning a summary judgment in an antitrust case, the Supreme Court noted "[s]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 500 (1969); *see In re Citric Acid Litigation*, 191 F.3d 1090, 1106 n.10 (9th Cir. 1999) ("[R]are is the antitrust case in which there is absolutely no evidence which could support some inference of an antitrust violation.").

## B. Standing Under the Sherman Act

Defendants contend that plaintiff lacks standing to bring his claims. Private suits to enforce the Sherman Act are authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15(a). *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000). The Clayton Act provides that "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore . . . ." 15 U.S.C. § 15(a). Despite the broad wording of the section, "[o]nly those who meet the requirements for 'antitrust *standing*' may pursue a claim under the Clayton Act; and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust injury.'" *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003). Antitrust injury is defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Antitrust injury is necessary to sustain such a cause of action

because the "antitrust laws . . . were enacted for 'the protection of competition not competitors.'" *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Antitrust injury requires: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent and (5) that the injured party is a participant in the same market as the alleged malefactors. *Id.* at 372.

Here, defendants argue that the unlawful conduct of which plaintiff complains is not of the type the antitrust laws were intended to protect. They contend that plaintiff's complaint "contains no allegation of increased price or decreased quality in the relevant market." Mem. Supp. Mot. J. on Pleadings at 7.

Antitrust laws are only concerned with acts that harm "allocative efficiency and raise[ ] the price of goods above their competitive level or diminish[ ] their quality." *Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (citing *Rebel Oil Co. v. ARCO*, 51 F.3d 1421, 1433 (9th Cir. 1995)). Thus, injury that flows from aspects of a defendant's conduct that are beneficial or neutral to competition is not "antitrust injury." *Id.*

Specifically, defendants argue that plaintiff has only claimed injury to himself and that such injury is insufficient to demonstrate the requisite effect on competition because it does not implicate harm to consumer welfare. The Ninth Circuit has repeatedly affirmed that "the elimination of a single competitor, standing alone, does not prove anticompetitive effect." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979); *see Rebel Oil*, 51 F.3d at 1433 ("Of course, conduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare."); *Austin v. McNamara*, 979 F.2d 729 & n. 11 (9th Cir. 1992) ("Nowhere in *Pinhas* did we suggest that injury to Pinhas alone would constitute sufficient evidence of injury to competition.").

However, plaintiff has raised a triable issue of fact concerning whether defendants' conduct has adversely impacted the quality of pediatric critical care services at Good Samaritan, thus resulting in injury to consumer welfare. Although the court recognizes that the conclusory allegations of public harm set forth under each of plaintiff's claim headings are insufficient to establish an injury to consumer welfare, *see Feldman v. Palmetto Gen. Hosp*, 980 F. Supp. 467, 469,

n.6 (S.D. Fla. 1997), plaintiff does offer evidence that suggests a reduction in the quality of services to patients as a result of the suspension of plaintiff's pediatric critical care privileges. *See, e.g.*, Decl. of Marjorie McCracken, M.D. (discussing an incident that took place after the suspension of plaintiff's privileges wherein an infant developed respiratory distress requiring treatment in the ICU but was unable to obtain it immediately from any physician with PICU privileges at Good Samaritan); Decl. of R. Lawrence Berkowitz, M.D. ("Dr. Fox's absence may have affected my ability to offer my services (cleft lip and plate work involving children and there are only a limited number of providers of this service in this area."); October 22, 1999 memo from Good Samaritan chief of staff announcing the complete suspension of PICU services at Good Samaritan. Additionally, although injury to plaintiff standing alone does not demonstrate antitrust injury, it may be probative of harm to competition. *See Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987). Thus, defendants are not entitled to summary adjudication that plaintiff lacks antitrust standing to assert his Sherman Act claims.

**C. Conspiracy to Violate Sherman Act § 1**

Defendants assert that Dr. Fox cannot maintain any conspiracy claims against them under Sherman Act § 1. Dr. Fox appears to base Counts I, II, and IV on violations of Sherman Act § 1. Count V of the operative complaint does allege an anticompetitive "combination or conspiracy," but this claim is based on Sherman Act § 2.

"To establish a claim under Section 1 of the Sherman Act, Plaintiffs must show 1) that there was a contract, combination, or conspiracy; 2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and 3) that the restraint affected interstate commerce." *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001). "The phrase 'contract, combination, or conspiracy' limits application of the Sherman Act [§ 1] to concerted conduct by more than one person or single entity." *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1449 (9th Cir. 1988). "Unilateral conduct by a single entity does not implicate Sherman Act § 1 regardless of the magnitude of the restraint on competition; only section two covers unilateral conduct." *Id.* at 1449-50. "[O]fficers or employees of the same firm

do not provide the plurality of actors imperative for a § 1 conspiracy." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984).

Good Samaritan, relying on out-of-circuit authority, argues by analogy to *Copperweld*, that the Hospital and the Medical Staff were legally incapable of forming a § 1 conspiracy. This conclusion seems inconsistent with *Oltz* in which the Ninth Circuit affirmed a finding that anesthesiologists with medical degrees conspired with a hospital to eliminate competition from nurse anesthesiologists, because the relationship between the hospital and the anesthesiologists was on a competitive, independent-contracting basis. Thus, by eliminating competition from the nurses, the anesthesiologists and the hospital "coalesced economic power previously directed at disparate goals." *Oltz*, 861 F.2d at 1450. Therefore, defendants' motion is denied as to the argument that the Hospital and the Medical Staff are incapable of forming a § 1 conspiracy.

Alternatively, Good Samaritan argues that Dr. Fox lacks any evidence of a conspiracy between the Hospital and the Medical Staff. In response, Dr. Fox presents circumstantial evidence from which he infers a conspiracy or unlawful concerted action. Although the court finds Dr. Fox's inferences problematic, it finds them sufficient to raise a triable issue of fact on whether the Hospital and the Medical Staff unlawfully conspired to exclude Dr. Fox from offering his PICU and PVM care at Good Samaritan. As noted in *In re Citric Acid Litigation*, 191 F.3d at 1106 n.10, "rare is the antitrust case in which there is absolutely no evidence which could support some inference of an antitrust violation." Although plaintiff cannot claim that the identical privileges call coverage rule was not based upon professional criteria or that he was entitled to an adjudicatory hearing on his suspension because both those claims were decided against him in state court, he is not precluded from arguing that the rule was nevertheless implemented not for the protection of patient care but to exclude him from his practice. The facts from which Dr. Fox can argue an unlawful conspiracy can be inferred include that: (1) he has unquestioned credentials and experience in pediatric critical care and pulmonology and worked for years without complaint with Dr. McCracken and Dr. Dahlstrom providing alternate care coverage; (2) his suspension occurred shortly after he had been warned by the Chief of the Medical Staff to "watch his back" after he had complained about his wife's treatment at the Hospital and after an unfounded complaint about his placement of a feeding tube in

one of his pediatric patients; (3) his suspension occurred relatively shortly after he reported to the state incidents of the violations of patients' rights at the Hospital; (4) his suspension occurred after his outspoken objection to transferring pediatric intensive care patients to the San Jose Medical Center; (5) around the time of his suspension the Hospital was negotiating with Dr. McConnell to have his group, a group that Dr. Fox felt could not provide adequate alternate call coverage, provide PICU services at the Hospital; and (6) the Hospital failed to approve or timely approve privileges applications by physicians Dr. Fox designated for alternate care coverage. Although persuasive alternative inferences can be drawn from the evidence, Dr. Fox has raised a triable issue of fact on the existence of a conspiracy.

### D. *Per Se* Antitrust Liability

Dr. Fox's first and second claims allege that defendants denied him procedural safeguards and fair procedure and that a group boycott of him was implemented by the "[a]ction of (Good Samaritan) and NorCal PICU in forcing him to cooperate or be totally excluded from such horizontal competition." He asserts that these actions had the effect of totally excluding him from practice at Good Samaritan and competing, thus constituting a *per se* antitrust violation.

Good Samaritan moves for summary adjudication that it cannot be liable on Dr. Fox's § 1 claims under the *per se* rule. As the Ninth Circuit has explained, "Some practices . . . are so likely to interfere with competition that they violate the Sherman Act per se. In these cases, we do not require evidence of any actual effects on competition because we consider the potential for harm to be so clear and so great." *Bhan v. NME Hosps.*, 929 F.2d 1404, 1410 (9th Cir. 1991). "Examples of practices which are illegal per se include horizontal price-fixing, division of markets, and certain tying arrangements." *Id.* Dr. Fox claims a "group boycott" by his "horizontal competitors" should be analyzed under the *per se* rule.

"[O]nly certain boycotts are unlawful per se. Nonetheless, the distinction between boycotts that are and those that must be tested under the rule of reason is less than crystal clear." *Id.* at 1412. "[T]he per se rule should be invoked for a group boycott when the challenged activity would almost always tend to be predominantly anti-competitive." *Id.* In *Bahn*, the Ninth Circuit found in another hospital-privileges dispute that the *per se* rule should not be applied because "hospitals must make

choices about the types of qualifications a practitioner must have to apply for staff privileges in various fields of practice." *Id.* Although in *Bahn* nurse practitioners rather than physicians had been excluded, Dr. Fox's attempt to distinguish the case on that ground is unavailing. Because a decision about privileges involves much more than a simple economic calculation, the *per se* rule of analysis is not applicable to Dr. Fox's § 1 claims.[3] Therefore, summary adjudication is granted for defendants on Counts I and II.

**E. Rule of Reason**

Good Samaritan also argues that Dr. Fox cannot prevail under the alternate framework of analysis for Sherman Act § 1 claims, the rule of reason. Under the rule of reason test,

> the fact finder must analyze the anti-competitive effects along with any pro-competitive effects to determine whether the practice is unreasonable on balance.
>
> To meet his initial burden in establishing that the practice is an unreasonable restraint of trade, plaintiff must show that the activity is the type that restrains trade and that the restraint is likely to be of significant magnitude. Ordinarily, a plaintiff to do this must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly.
>
> A full-blown market analysis is not necessary. A lesser analysis may show that the restraint has actually produced significant anti-competitive effects, such as a reduction in output. If the plaintiff can make a showing of anti-competitive effects, a formal market analysis becomes unnecessary.
>
> Should the plaintiff satisfy his initial burden, the defendant must offer evidence of pro-competitive effects. The plaintiff, driven to this point, must then try to show that any legitimate objectives can be achieved in a substantially less restrictive manner. Finally, the court must weigh the harms and benefits to determine if the behavior is reasonable on balance.

*Id.* at 1413 (citations omitted).

Dr. Fox, based on his own declaration, seeks to define the relevant geographic market as Good Samaritan Hospital. Good Samaritan counters that the relevant geographic market is at least

---

[3] The Seventh Circuit has noted that:

> The cases involving staffing at a single hospital are legion. Hundreds, perhaps thousands of pages in West publications are devoted to the issues those circumstances present. . . . Those hundreds or thousands of pages almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of section 1 of the Sherman Act.

*BCB Anesthesia Care, Ltd. v. Passavant Mem. Area Hosp. Ass'n*, 36 F.3d 664, 667 (7th Cir. 1994).

Santa Clara County and presents expert testimony to back this up.[4]  In *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, the Ninth Circuit refused to accept the "conclusory" definition of the relevant geographic market by a pair of physicians.[5]  924 F.2d 1484, 1490 (9th Cir. 1991). However, the court finds Dr. Fox's explanation regarding how patients obtain pediatric intensive care services at least plausible, and his criticism of the opinion of Good Samaritan's expert appears to have some merit.  In addition, "[o]rdinarily, the relevant market is a question of fact for the jury." *Id.* at 1489. Therefore, the court accepts, for the purposes of this current motion, Dr. Fox's geographic market for the "rule of reason" analysis.  The court will also accept Dr. Fox's argument that Good Samaritan possesses market power in this one-hospital geographic market.

As discussed above in the section analyzing antitrust injury, some evidence marginally supports the conclusion that competition was harmed by Dr. Fox's withdrawal from the Hospital. The quality of PICU services, according to Dr. Fox, diminished after he was allegedly pressured to leave by the implementation of the identical coverage requirement, thus harming consumer welfare.

The ultimate question under a "rule of reason" analysis is whether the anticompetitive aspects of the challenged practice outweigh its pro-competitive effects.

> The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects. We review all the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and we determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects.

*Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003) (affirming summary judgment for defendant where court gave plaintiff the benefit of all reasonable inferences from the evidence and concluded that the procompetitive justifications still plainly outweighed the

---

[4]  The parties appear to agree on the relevant product market or markets.

[5]  Specifically, the Ninth Circuit stated:

> Drs. Strand and Taylor conclusorily state that the relevant geographic market is Tucson.  We give little weight to such a conclusory assertion.  We find no evidence that those two principals were experts qualified to opine on a highly technical economic question.  Equally important, we find no record evidence that could support their conclusion.  MSW & B cite only two evidentiary items to support their geographic market definition.

*Morgan, Strand*, 924 F.2d at 1490.

alleged anticompetitive effects.).  Although in *Paladin* the court found as a matter law that the procompetitive justifications outweighed the anticompetitive effects, the balancing test generally involves a question of fact.  *See, e.g., Miller v. Indiana Hosp.*, 843 F.2d 139, 144 (3rd Cir. 1988) (whether hospital revoked surgeon's staff privileges due to incompetence or for purpose of destroying surgeon's competition was question of fact in surgeon's antitrust action alleging violation of the rule of reason and, therefore, precluded summary judgment).

In the present case, there is persuasive evidence that the identical privileges rule was implemented for the improvement of patient care and did not have significant anticompetitive effects.  The state court found that the enactment and enforcement of the identical privileges rule was "rationally related to improving patient care."  RFJA, Ex. A at 5.  The Hospital provided PICU services through a non-exclusive arrangement with NorCal PICU, and the opportunity was always available to Dr. Fox to practice PICU services at Good Samaritan if he merely complied with the identical coverage requirement.  However, there is evidence, discussed above, from which one could infer that implementation of the identical privileges rule was targeted to preclude competition from Dr. Fox, that patient welfare suffered and that the reason given for the implementation of the rule was pretextual.  Therefore, summary judgment is denied on Count IV.

### F.  Conspiracy to Violate Sherman Act § 2

Count V of Dr. Fox's complaint alleges that the Hospital and Medical Staff entered into a conspiracy to obtain and did obtain monopoly power over market prices in and did exclude competition from providing of pediatric intensive care services.  "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony . . . ."  15 U.S.C. § 2.  To demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  As discussed above, there is some evidence from which an inference of a conspiracy can be drawn and some evidence from which one could conclude that defendants acquired monopoly power over pediatric intensive care services and did so by

implementing the identical privileges rule and utilizing Nor Cal PICU to render those services in a manner that effectively lessened competition and the quality of those services. Defendants' motion for summary judgment as to Count V is denied.

### G. Statutes of Limitation

#### 1. Federal Antitrust Claims

Good Samaritan asserts Dr. Fox's claims are barred as untimely. "Any action to enforce any cause of action under [15 U.S.C. §§] 15, 15a, or 15c [ ] shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Good Samaritan suspended plaintiff's privileges in June 1999 and plaintiff left Good Samaritan in September 1999; he filed this action over four years later in March 2004. Plaintiff's antitrust claims plaintiff have statutes of limitation of four years. Therefore, Dr. Fox's claims are barred, unless, as Dr. Fox claims, subsequent acts by Good Samaritan constitute new injuries, restarting the statute of limitations, or his state-court litigation tolled the statutes of limitation.

Certain "overt act[s] . . . will restart the statute of limitations." *Pace Indus. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987). As the Ninth Circuit has explained:

> A cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act. A continuing violation is one in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured. However, even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act.

*Id.* Not all acts are sufficient to restart the statute of limitations. "[T]wo elements characterize an overt act which will restart the statute of limitations: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Id.* at 238.

The Ninth Circuit has held that the statute of limitation runs from the first of multiple refusals to sell, *David Orgell, Inc. v. Geary's Stores*, 640 F.2d 936 (9th Cir. 1981), as well as from the first of multiple refusals to buy, *AMF, Inc. v. General Motors Corp.* (*In re Multidistrict Vehicle Air Pollution*), 591 F.2d 68, 72 (9th Cir. 1979). Merely receiving payments under an anticompetitive contract does not restart the statute of limitations. *Aurora Enters. v. Nat'l Broad.*

*Co.*, 688 F.2d 689, 694 (9th Cir. 1982).  On the other hand, filing suit to enforce an anticompetitive contract will restart the statute of limitations, *Twin City Sportservice v. Charles O. Finley & Co.*, 512 F.2d 1264, 1270 (9th Cir.1975), although taking an appeal in such a suit does not, *Pace*, 813 F.2d at 239.  Paying a third party to "shepherd" potential customers away from a competitor is also an overt act sufficient to restart the statute of limitations each time it occurs.  *Hennegan v. Pacifico Creative Serv.*, 787 F.2d 1299, 1300-01 (9th Cir. 1986).

Here, Good Samaritan adopted the identical privileges rule in April 1999.  Good Samaritan denied plaintiff's application for privileges in April 1999 and suspended his PICU privileges in June 1999 (a decision upheld by its trustees in November 1999).  Plaintiff removed his practice from Good Samaritan in September 1999.  Plaintiff again applied for privileges in March 2002.  Good Samaritan did not act upon that application until after plaintiff filed a petition for a writ of mandate with the state superior court in April 2003; Good Samaritan granted plaintiff PICU privileges in September 2003.

Plaintiff's primary grievance is his exclusion from practice at Good Samaritan's pediatric intensive care unit.  Good Samaritan's identical privileges rule went into effect in April 1999 and Good Samaritan first denied plaintiff privileges under that rule the following June.  Plaintiff took his practice away from Good Samaritan in September 1999.  Therefore, plaintiff suffered injury in 1999 and the statute of limitations accrued.  Therefore, his antitrust claims are barred, unless there was a new and independent injury inflicted by defendants thereafter.  If Good Samaritan's subsequent acts were only the affirming of the denial of privileges or defending against plaintiff's state-court suits, the statute would not accrue again based on these acts as they were not  "new and independent acts"—all such actions were "merely a reaffirmation of" the initial denial under the identical privileges rule.  *See Pace*, 813 F.2d at 238.  However, Dr. Fox asserts that defendants, as part of their anticompetitive conduct, delayed or failed to act on applications for identical privileges submitted by his alternate care designees.  Sufficient facts exist from which reasonable inferences can be drawn supporting Dr. Fox's assertion.  *See, e.g.,* McCracken Decl. ¶ 7, Fox Decl. ¶¶ 37-38.  If Dr. Fox can prove that the Hospital delayed or failed to approve privileges applications to

frustrate his renewed applications in 2002 and 2003, such conduct would constitute new and independent acts, thus restarting the running of the statute of limitations.

Dr. Fox also argues that his pursuit of administrative remedies within Good Samaritan Hospital and his petitions for writs of mandamus in the California state court system tolled the running of the statute of limitation on his antitrust claims. In support of this argument, plaintiff cites *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001) (*en banc*), *Mt. Hood Stages v. Greyhound Corp.*, 616 F.2d 394 (9th Cir. 1980), and *Nichols v. Hughes*, 721 F.2d 657 (9th Cir. 1983).

*Daviton* involved claims for disability discrimination. 241 F.3d at 1133. Even though the claims for relief were federal, as Congress has not provided "a federal statute of limitations for claims arising under the Civil Rights Acts of 1866 and 1871, the controlling statute of limitations is the most appropriate one provided by state law." *Id*. at 1135. The Ninth Circuit was therefore using California, not federal, law to determine whether the plaintiff's claims had been tolled. *See id*. at 1135-42. Antitrust claims, on the other hand, have their own federal statute of limitation, 15 U.S.C. § 15b, so *Daviton* is inapplicable.

Plaintiff's resort to *Nichols* is likewise unavailing. There, the court stated that "the general rule is that if prior resort to an administrative body is a prerequisite to review in court, the running of the limitation period will be tolled during the administrative proceeding." 721 F.2d at 659. However, the court in *Nichols* was merely stating a general rule; the case involved a claim for wrongful discharge from the U.S. Navy and the court did not reach the tolling question because even with exhaustion for administrative proceedings, the claim was not timely. *Id*. at 658-59. In other cases, discussed below, the Ninth Circuit has analyzed more particularly tolling in the antitrust context.

In *Grimmett v. Brown*, 75 F.3d 506, 515-16 (9th Cir. 1996), in the course of finding that the RICO claims of plaintiff Joanne Siragusa were not tolled by her bankruptcy action, the court explained its precedents on tolling of antitrust claims, particularly *Mt. Hood*:

> In *Mt. Hood*, the Interstate Commerce Commission (ICC) permitted Greyhound to acquire a number of bus companies whose routes circled Mt. Hood on the condition that Greyhound not interfere with bus routes going through the mountain. Greyhound

started to violate the condition, and one of its competitors, Mt. Hood Stages, filed a complaint with the ICC in 1964. When Mt. Hood Stages sued for antitrust violations in 1968, Greyhound moved to dismiss because the four-year limitations period had started to run in 1960. Mt. Hood Stages contended that the ICC proceeding tolled the limitations period, and we agreed. We reasoned that Greyhound would be immune from antitrust liability if its challenged transportation practices were necessary to effectuate the acquisitions approved by the ICC. The necessity of the practices could only be decided by the ICC as an expert body. Thus it was appropriate to toll the running of limitations on the antitrust claim until the ICC had made "a preliminary determination of issues within its primary jurisdiction." *Id.* at 405.

Subsequent cases have read *Mt. Hood* narrowly and limited its application to cases involving "considerations of federal policy and primary jurisdiction." *Pace*, 813 F.2d at 241; *Community Elec. Serv. v. National Elec. Contractors Ass'n, Inc.*, 869 F.2d 1235, 1241 (9th Cir.), *cert. denied*, 493 U.S. 891, 110 S. Ct. 236, 107 L. Ed. 2d 187 (1989). In *Conley v. International Brotherhood of Elec. Workers*, 810 F.2d 913 (9th Cir. 1987), the plaintiff filed a petition with the National Labor Relations Board and then brought a court action stating similar claims of unfair labor practices, violations of the Labor-Management Relations Act, and violations of state law. We read *Mt. Hood* to say that "[e]quitable tolling is most appropriate when the plaintiff is required to avail himself of an alternative course of action as a precondition to filing suit." *Id.* at 915. In that case, the NLRB suit was merely a "parallel avenue[ ] of relief" to the court action. *Id.* at 916. Thus, we refused to toll the period while the NLRB had considered the plaintiff's petition. *See also Community Electric*, 869 F.2d at 1241 (refusing to toll statute of limitations for period in which plaintiff sought relief from NLRB because prior resort to the NLRB "was not a prerequisite to review in federal court"); *Pace*, 813 F.2d at 240 ("Prior judicial actions, however, 'do not toll the statute of limitations, no matter how close their relationship to the one at bar.'") (citation omitted).

Given this interpretation of *Mt. Hood*, Siragusa's claim fails. Unlike the ICC's jurisdiction over immunity claims, the primary jurisdiction of the bankruptcy court is not RICO claims. With respect to RICO claims, the bankruptcy court and federal court are more properly considered "parallel avenues of relief." Even if Siragusa could have raised her RICO claim in some form in the bankruptcy proceeding, *see In re The Monetary Group*, 2 F.3d 1098, 1099 (11th Cir. 1993), she could have simultaneously pressed her claim in federal court since the automatic stay did not apply to her claim against Brown, who was not the debtor, *see* 11 U.S.C. § 362(a); *In re Kalispell Feed & Grain Supply*, 55 B.R. 627, 629 (Bankr. D. Mont. 1985). Thus, the bankruptcy proceeding did not toll her RICO claim.

*Grimmett v. Brown*, 75 F.3d 506, 515-16 (9th Cir. 1996).

Federal courts have exclusive jurisdiction over antitrust claims. *Kern-Tulare Water Dist. v. City of Bakersfield*, 828 F.2d 514, 518 (9th Cir. 1987). Neither plaintiff's administrative remedies nor his mandamus petitions were preconditions to his filing antitrust claims in federal court.[6] Any

---

[6] Dr. Fox's argument that the Medical Staff bylaws cut off his access to federal court and therefore tolled the statute of limitations is unavailing. The provision Fox refers to provides:

**7.5-8  Challenges to Rules.** The hearing provided for in this Article shall not

remedies plaintiff could obtain from Good Samaritan or the California state-court system were unrelated to his antitrust claims before this court, as noted in this court's order on Good Samaritan's motion for judgment on the pleadings: "The state court determined that the suspension was lawful within the context of state law. It did not examine whether such acts would have been lawful in the context of an antitrust claim of monopolization." Order (docket no. 57) at 15. This is unlike the situation in *Mt. Hood*, where prior resort to the Interstate Commerce Commission was necessary for the plaintiff to pursue its antitrust claims in court. Instead, the present situation is governed by *Grimmett*. Plaintiff's antitrust claims are "parallel avenues of relief" to the other remedies he has previously pursued; nothing indicates that plaintiff could not have simultaneously advanced his antitrust claims here and his other claims elsewhere. Tolling, therefore, is not available to Dr. Fox. However, since there is a material issue of fact as to whether defendants committed "new and independent" acts within the four years before he filed, summary judgment that the statute of limitations bars his antitrust claims is denied.

### 2. State Claims

Defendants assert that plaintiff's two state law claims are barred by the two-year statute of limitation set forth in Cal. Code of Civ. Proc. § 339(1) (action on obligation or liability not founded upon written instrument). The parties do not dispute the application of § 339(1) but plaintiff argues that the statute was tolled by Dr. Fox's exhaustion of administrative remedies. Plaintiff's first state law claim, Count VI, alleges that his PICU and adult pulmonary privileges were withheld in retaliation for advocating for appropriate medical care for patients and that such retaliation was in violation of California Business and Professions Code §§ 510-12 and 2056. Those sections provide protection against retaliation for health care practitioners who advocate for appropriate health care

---

be utilized to make determinations as to the substantive validity of a Bylaw, rule, regulation, or policy. Where the substantive validity of such Bylaw, rule, regulation, or policy is the only issue, the petitioner shall have a direct appeal and hearing, in the first instance to the Staff Executive Committee with an appeal to the Board of Trustees. Such hearing and appeal must be utilized prior to resorting to legal action.

Dr. Fox, however, asserts that he is not challenging the "substantive validity" of the identical privileges rule, which the parties do not dispute is not uncommon in modern hospitals. He, instead, claims the stated reasons for adoption and implementation of the rule were pretextual to cover-up the Hospital's retaliation and anti-competitive conduct.

for their patients.  Specifically, Dr. Fox asserts that the Hospital retaliated against him because he complained about the treatment provided to his wife following some diagnostic testing she underwent at Good Samaritan in 1992 and because in 1999 he filed a complaint with the California Department of Health Services against Good Samaritan for interference with his treatment of a critically-ill child.  The retaliation, according to Dr. Fox, consisted of arbitrarily adopting the identical coverage requirements, the refusal to provide him an appropriate hearing before suspending his PICU and pulmonary privileges, and the referral of patients to his Hospital-employed competitors.

The conduct that Dr. Fox claims led to the retaliation occurred in or before 1999.  On June 2, 1999 the Chief of Staff of Good Samaritan advised Dr. Fox that his clinical privileges for PICU care without consultation and ventilator care were administratively suspended with approval of the Board of Trustees.  On June 23, 1999 and February 1, 2000, Dr. Fox requested a "judicial hearing" pursuant to the Hospital by-laws.  Dr. Fox thereafter discussed his case with the Medical Staff Committee on November 12, 1999 and with the Board of Trustees on April 26, 2000.  On April 27, 2000 Dr. Fox received the Hospital's decision affirming the determination to suspend his privileges in ventilator management and care of pediatric patients in the Intensive Care Unit.  In the meantime, in September 1999, Dr. Fox notified the Hospital's Pediatric Department that he had relocated his office to Los Gatos Community Hospital.  Dr. Fox filed his original Petition for a Writ of Mandate with the state superior court on October 17, 2001 and his Amended Petition on January 8, 2002 by which he sought to have the suspension of his privileges set aside and the determination to suspend them reconsidered in a "fair procedure."  The writ petition was denied February 28, 2002 by the superior court, and the denial was affirmed on appeal on July 18, 2003 by the court of appeals.  Dr. Fox's complaint was filed in this court on March 4, 2004.

Even assuming that Dr. Fox was required to exhaust his administrative remedies pursuant to section 7.1-7 of the Hospital's by-laws, he completed exhaustion by no later than April 27, 2000, the date on which he was advised that the determination to suspend his privileges in ventilator management and care of pediatric patients in ICU had been affirmed by the Board of Trustees.  He did not file his retaliation claim until March 4, 2004, substantially over two years later.

However, Dr. Fox also claims that the Hospital's failure to grant privileges to some physicians who could have provided identical coverage for him was additional retaliatory conduct and that it occurred within the two years before he filed his federal action. As discussed in connection with Dr. Fox's antitrust claims, there is sufficient evidence to raise a triable issue of fact on this question. The court does not resolve in this ruling, and the parties did not brief, the question of whether plaintiff is limited to recovery on his state claims for only those acts occurring in the two years before he filed suit or whether he can reach back and recover for alleged acts occurring in 1999 as being the beginning acts in a continous tort that lasted into the two year period prior to his filing.

Dr. Fox's second state claim, Count VII, alleges breach of the implied covenant of good faith and fair dealing. Dr. Fox asserts that the Hospital Medical Staff bylaws contained an implied covenant to perform the bylaws' terms and conditions fairly and in good faith. Although Claim VII is general in its allegations, the gist appears to be that the Hospital created and applied the alternate coverage rule unfairly and in bad faith. Dr. Fox claims that since a conspiracy has been alleged, the statute did not begin to run until the last overt act. Although the continued withholding of some of Dr. Fox's privileges was merely a continuation and adherence to the Hospital's initial decision, that continued withholding was not an overt act sufficient to restart the running of the statute of limitation. However, Dr. Fox again claims that the Hospital's failure to grant privileges to some physicians who could have provided identical coverage for him was additional bad faith conduct and that it occurred within the two years before he filed his federal action. As discussed in connection with Dr. Fox's antitrust claims and state retaliation claim, there is sufficient evidence to raise a triable issue of fact on this question.

The California superior court, in denying a third writ application by Dr. Fox, did find that "the deferral of Petitioner Richard Fox's Ventilation Management privilege in his 2004 application for Medical Staff membership for failure to comply with the alternate call coverage rule by Good Samaritan Hospital was not arbitrary, capricious and discriminatory, as Petitioner fails to demonstrate the physicians he designated satisfy the rule." Order to Amended Verified Petition for Writ of Mandate and Motion for Hearing on Writ of Mandate, Case no. 1-04-CV-026778, Santa

Clara County Superior Court.  The superior court, however, did not examine or rule on any claim by Dr. Fox that the delay or failure to grant privileges to his designees was in bad faith.  Therefore, since that alleged failure or delay took place within the two years before he filed, summary judgment on the statute of limitations is denied as to Count VII.

**H.  Continuance under Rule 56(f)**

Dr. Fox asks for more time to conduct discovery under Rule 56(f).  However, this case has been pending for a long time, discovery has not been diligently pursued and there is no showing that discovery would be likely to uncover any additional basis of liability.

### III.  ORDER

For the foregoing reasons, the court grants Good Samaritan's motion for summary judgment on Counts I and II and denies it as to Counts IV, VI and VII.

DATED:      10/9/07                          *Ronald M Whyte*
                                    RONALD M. WHYTE
                                    United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

James A. Hennefer         jhennefer@hennefer-wood.com
Joseph Wood              jwood@hennefer-wood.com

**Counsel for Defendants:**

Beth McGowan
Katharine L. West         kwest@mdbe.com
Ross E Campbell

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**       10/9/07                  /s/ MAG
                                       **Chambers of Judge Whyte**