IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

RICHARD B. FOX,

        Plaintiff,

  v.

GOOD SAMARITAN L.P., et al,

        Defendants.

_____/

**No. C 04-0874 RS**

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This action had its genesis in 1999 when plaintiff Richard B. Fox, who by all accounts is a highly competent and well respected pediatrician, had his privileges to practice at Good Samaritan Hospital ("GSH") suspended. The ostensible basis for that action was Fox's refusal to comply with a then newly imposed rule requiring pediatricians to designate as "back-ups" two physicians holding privileges identical to those of the applying physician. Fox insists, however, that the true reasons for the adoption of the rule and its application to him were, (1) to retaliate against him for his having advocated patients rights and for criticizing some elements of patient care at the hospital in instances

dating back to 1992, and (2) an effort by the hospital to impose a monopoly in the provision of pediatric intensive care services.

A decade of litigation has followed, both in the state courts and here, the tortuous history of which has been amply described in prior orders and need not be recounted.  The Court is keenly aware of the significant resources the parties, and a number of courts, including this one, have devoted to this matter.  Nevertheless, it has become apparent in this final wave of motion practice that Congress has by statute unambiguously and definitively barred plaintiffs in Fox's position from recovering damages in actions like this, under the circumstances that exist here.  Additionally, GSH's corporate parent, defendant HCA, Inc., has shown that under the undisputed facts and the Court's prior orders, there is no basis for imposing liability against it in any event.   Accordingly, summary judgment will be entered in favor of all defendants.

## II.  BACKGROUND

The general factual and procedural background of these consolidated actions has been exhaustively set forth in numerous prior orders, and will not be repeated here.  In a nutshell, Fox practiced pediatric pulmonology and pediatric critical care medicine at GSH as a member of its medical staff beginning in 1989.  Fox's privileges to practice were subject to renewal every two years. In April 1999, GSH's Medical Staff Executive Committee, on recommendation of the Credentials Committee and the Department of Pediatrics, adopted the "identical privileges" rule, requiring that a physician's designated "back-ups" hold the same set of privileges as the applicant.[1] Fox declined to comply with the rule, resulting in the suspension of his privileges in June of 1999, "until such time as documentation of call coverage by providers with identical privileges has been provided or a written request for waiver by the Staff Executive Committee has been approved." Although Fox was successful in having his privileges restored at certain later points in time, the issue never went away, and Fox no longer practices at GSH.

---

[1] A version of the rule was initially implemented in 1997, causing a delay in approving Fox's biennial application for reappointment in 1998, but his privileges were temporarily continued while the Medical Staff further considered the matter.

2

In 2001, Fox sought a writ of mandate in the state courts. The Santa Clara County Superior Court held that plaintiff was not entitled to a judicial review hearing and that "the alternate call coverage rule is rationally related to improving patient care, and is not arbitrary and capricious." *Fox v. Good Samaritan Hosp.*, No. CV802341 (Cal. Superior Court February 28, 2002). In affirming the trial court, the Sixth District Court of Appeal stated, among other things, that the "Hospital's alternate call coverage rule was based upon 'professional criteria' and was 'uniformly applied to all medical staff applicants and members.'" *Fox v. Good Samaritan Hosp.,* 2003 WL 21675515 * 5 (Cal. Ct. App. July 18, 2003). This action followed in 2004.

### III. LEGAL STANDARD

The standards on summary judgment are well settled. Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-324 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. If the moving party meets this burden, then the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).

3

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

These general standards are subject to some additional refinement both in the context of antitrust actions and in connection with the statute that extends immunity from damages in cases of this nature. Those specific considerations are discussed further where relevant below.

## IV. DISCUSSION

A. <u>The Motion for Summary Judgment brought by all defendants[2]</u>

   1. <u>HCQIA</u>

Defendants contend that all of Fox's claims in this actions are barred under the provisions of the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101, et seq. ("HCQIA"). Congress enacted that statute for the stated purpose of addressing the concern that, "[t]he threat of private money damage liability under Federal laws, including treble damage liability under Federal

---

[2] At the hearing on the motion brought by all defendants, Fox cited for the first time *Williams v. University Medical Center of Southern Nevada*, 2010 WL 668512 (D. Nev. Feb. 24, 2010). The Court authorized defendants to respond to *Williams* by post-hearing letter brief, and gave Fox permission to reply thereafter to such submission. Defendants filed a letter brief that arguably went substantially beyond merely responding to *Williams*, but which did not clearly violate any rule. Fox, in turn, filed a brief that went even further beyond the spirit of the leave that had been given for supplemental briefing, in that it raised several entirely new arguments. Predictably, defendants filed another brief crying foul, and urging the Court to strike the new arguments. Fox responded yet again, contending his prior brief was proper. When the fourth brief came in, the Court gave serious consideration to issuing a one word order: "STOP!" Fortunately, that did not prove necessary. While violations of the rules on unsolicited briefing are not to be ignored, given the enormous consequences of the issues raised in the additional briefing, the Court is exercising its discretion to consider all of the substantive points raised by both sides therein.

4

antitrust law, unreasonably discourages physicians from participating in effective professional peer review." §11101(4).

> The Act creates a form of protection from liability in damages for hospitals and peer review participants. Although it never actually uses the term "immunity," the Act provides that if a "professional review action" meets the Act's standards, the peer reviewers "shall not be liable in damages under any law of the United States or of any State ... with respect to the [professional review] action." 42 U.S.C. § 11111(a)(1).

*Manion v. Evans*, 986 F.2d 1036, 1037-1038 (6th Cir. 1993).

The question, therefore, is whether the undisputed facts establish that HCQIA applies to all of the claims in this action and whether its standards for immunity against damages have been satisfied.

### a. Definitions

HCQIA plainly contemplates situations where a peer review committee has prompted an action against a physician's privileges based on concerns regarding the competency of the particular physician in question. Here, it is undisputed that at no time did any questions arise as to Fox's *own* competency. Yet, until his supplemental briefing, Fox made no argument that the statute is so narrowly drawn that it cannot apply here for that reason. Review of the statutory definitions reveals HCQIA is in fact implicated under these circumstances.

At the outset, the decision to suspend Fox's privileges for failure to comply with the alternate coverage rules was a "professional review activity" as defined in the statute. § 11151(10).[3] Next, the term "professional review *action*" is defined to include privileging decisions "based on the competence or professional conduct of an individual physician (which conduct affects or could

---

[3] That subdivision provides: "The term "professional review activity" means an activity of a health care entity with respect to an individual physician—
   (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
   (B) to determine the scope or conditions of such privileges or membership, or
   (C) to change or modify such privileges or membership."

All three circumstances apply here.

5

No. C 04-0874 RS
ORDER

affect adversely the health or welfare of a patient or patients) and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician." §11151(9). In his supplemental briefing, Fox argues for the first time that this language precludes application of the statute here, where the concern related to the privileges of Fox's designated alternates, rather than his own medical competence. This argument fails for at least three reasons.

First, while Fox's own medical "competence" may not have been in question *per se*, the issue *did* involve the quality of care he was able to provide to his patients through his designees.[4] Second, even assuming the matter could not be characterized as implicating Fox's *competence* in any sense, the decision to suspend Fox's privileges for his refusal to comply with the identical privileges rule plainly was a matter involving Fox's own professional *conduct*. The statutory definition is disjunctive—it applies to decision relating to competence *or* professional conduct. Third, Fox's new argument that the statute is simply inapplicable is undermined by his own complaint in which he specifically alleged that HCQIA was available to immunize defendants' conduct provided its substantive provisions were met. Second Amended Complaint ¶¶ 77-78. Even assuming this does not rise to the level of a judicial estoppel, it serves as an additional basis to refuse to construe the statute as narrowly as Fox now urges, in a hyper-technical reading at odds with its general intent and purposes.

Fox's supplemental briefing makes the additional argument that the statute is inapplicable by virtue of section 11151(9)(D) of HCQIA, which excludes from the definition of "professional review action" any privileging decision based on "a physician's association with, supervision of, delegation of authority to, support for, training of, or participation in a private group practice with, a member or members of a particular class of health care practitioner or professional." Fox argues this provision is implicated because he refused to designate as his backups members of the NorCal

---

[4] This is not to suggest that there was any concern that the physicians designated by Fox for his alternate coverage had ever demonstrated "incompetence" in the sense that they had deviated from the standard of care. That said, the identical privileges rule was directed to ensuring competence in the sense of appropriate qualifications, experience, and training on the part of the designated back-up doctors.

6

**No. C 04-0874 RS**
ORDER

PICU associates. While the provision is certainly directed at excluding from statutory protection any privileging decision based on a physician's professional associations, it cannot be stretched to encompass the application of GSH's identical privileges rule, which by its terms did not mandate the designation or exclusion of any particular doctor or group. Accordingly, the decision to suspend Fox's privileges was an action within the ambit of HCQIA such that its prohibition against damages is available if its provisions are otherwise satisfied.

### b. Immunity

As noted, the immunity from damages is set out in section 11111. That section provides, among other things, that the "professional review action" will only qualify for immunity if it "meets all the standards specified in section 11112(a)." Section 11112(a), in turn, requires that a professional review action must be taken—

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

Critically, however, section 11112(a) goes on to provide that "[a] professional review action *shall be presumed to have met the preceding standards* . . . unless the presumption is rebutted by a preponderance of the evidence. Furthermore, as the Ninth Circuit has explained, "[b]ecause the 'reasonableness' requirements of § 11112(a) were intended to create an objective standard, rather than a subjective standard, this inquiry may be resolved on summary judgment." *Smith v. Ricks*, 31 F.3d 1478, 1485 (9th Cir. 1994).[5]

---

[5] As explained in *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318 (11th Cir. 1994): "A district court should consider the issue of HCQIA immunity from damages at the summary judgment stage. If it determines that the defendant is not entitled to such protection, then the merits of the case should be submitted to the jury without reference to the immunity issue. If there are

7

Moreover, "the rebuttable presumption 'creates a somewhat unusual standard' of review for summary judgment because the 'inquiry focuses on whether [plaintiff] has provided sufficient evidence to permit a jury to find that he has overcome, by a preponderance of the evidence, the presumption that physicians in the defendants' position would reasonably have believed that their action was warranted by the facts." *Id.* (quoting *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir.1992). Importantly, evidence of bad faith or hostility towards Fox on the part of the actual decision-makers is simply *irrelevant* and cannot serve to create a material issue of fact on this point. *Austin*, 979 F.2d at 734 (Plaintiff's "assertions of hostility do not support his position because they are irrelevant to the reasonableness standards of §11112(a). The test is an objective one, so bad faith is immaterial.")

The *only* argument Fox offered in his original opposition that the fairness standard of §11112(a) was not satisfied here was the naked two-sentence assertion: "The fairness standards required, *inter alia*, that Dr. Fox have the right to a representation to a record [sic] and to call and examine witnesses. Dr. Fox was accorded none of these rights by defendants." It appears that Fox may have believed that "fairness" necessarily includes those rights in light of §11112(**b**), which lists such procedures, among others, that will be *deemed* to satisfy §11112(a), if provided. Section 11112(b), however, only provides a "safe harbor"—it also expressly provides that a failure to comply with all of its provisions, "shall not, in itself, constitute failure to meet the standards of subsection (a)." See *Ricks*, *supra*, 31 F.3d at 1485 n. 5 ("we reject as dicta any suggestion in *Austin* that a hospital [must] satisfy § 11112(b) in order to receive immunity.")

The text of section 11112(a) itself reveals that not even "adequate notice and hearing procedures"—much less all those specified in subsection (b)—are necessarily required. Rather, "such other procedures as are fair to the physician under the circumstances" will suffice in

---

disputed subsidiary issues of fact concerning HCQIA immunity, such as whether the disciplined physician was given adequate notice of the charges and the appropriate opportunity to be heard, the court may ask the jury to resolve the subsidiary factual questions by responding to special interrogatories . . . . Under no circumstances should the ultimate question of whether the defendant is immune from monetary liability under HCQIA be submitted to the jury." 33 F.3d at 1333.

8

appropriate circumstances. Here, Fox's contention that he was entitled to something more than he was given was rejected by the California state courts. Even assuming the state court's determination is not binding in any *res judicata* sense, it undermines any claim Fox could otherwise now make that there is a triable issue of fact as to the procedural "fairness" of the professional review action.

At the hearing and in his supplemental briefing, Fox made the more nuanced argument that two separate decisions are actually at issue. First, the *adoption* of the "equal privileges" rule was, Fox contends, a quasi-legislative act. While Fox does not concede that he had adequate notice and hearing even with respect to the adoption of the rule, there is some merit to his contention that the *application* of the rule to him requires a separate fairness analysis. Nevertheless, Fox has not met his burden to show that he was entitled to further notice or hearing before his privileges were suspended for failure to comply with the rule. In *Wahi v. Charleston Area Medical Center*, 562 F.3d 599 (4th Cir. 2009), the court expressly held that a hearing regarding a physician's suspension is not necessary in all circumstances for HCQIA immunity to apply. Rather, the statutory language, "such other procedures as are fair under the circumstances," reflects a Congressional intent that "a physician be afforded adequate and fair 'procedures' with regard to professional review actions, which could be something other than a formal hearing in some circumstances." *Wahi*, 562 F.3d at 609; *see also Singh v. Blue Cross and Blue Shield of Mass. Inc.*, 182 F.Supp.2d 164, 173 (D.Mass. 2001) ("no hearing is required under the HCQIA").

Here, it is highly relevant that the professional review actions at issue did *not* involve complicated factual issues as to whether Fox had met the standard of care in specific patient cases. The sole question to be decided was whether Fox had complied with the rule, and there is no dispute that he had not. Fox was given *multiple* notices that he must comply. More fundamentally, Fox has not shown that a hearing, a right to representation, a right to call witnesses, and similar procedures were necessary to make the proceedings fair under the circumstances because he does not suggest that he would ever have been able to show either that the rule did not exist or that he was in compliance with it, regardless of how many witnesses he called. Thus, Fox was in circumstances wholly unlike that of a doctor who has been charged with an instance of deviating from the standard

9

of care in one or more patient cases. The process Fox was given here was "fair to the physician under the circumstances," and he has not demonstrated a factual dispute to the contrary.[6]

Fox's bare assertion that the procedure was unfair because he did not have representation, the right to call witnesses, and the like, is insufficient to meet his burden to "provide sufficient evidence to permit a jury to find that he has overcome, by a preponderance of the evidence, the presumption that physicians in the defendants' position would reasonably have believed that their action was warranted by the facts." *Ricks*, supra, 31 F.3d at 1485. It is not "evidence" at all, but mere unsupported argument.

### c. Reporting requirement

Under HCQIA, a hospital must report to the Board of Medical Examiners whenever it "takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days." § 11133(a)(1)(A). Defendants grudgingly admit that this provision at least arguably required them to report Fox's suspension, and there is no dispute they did not do so. Nevertheless, Fox's argument that this defeats immunity under HCQIA is not well taken.

Section 11111(b), entitled "Exception," provides:

> If the Secretary has reason to believe that a health care entity has failed to report information in accordance with section 11133(a) of this title, the Secretary shall conduct an investigation. If, after providing notice of noncompliance, an opportunity to correct the noncompliance, and an opportunity for a hearing, the Secretary determines that a health care entity has failed substantially to report information in accordance with section 11133(a) of this title, the Secretary shall publish the name of the entity in the Federal Register. The protections of subsection (a)(1) of this section shall not apply to an entity the name of which is published in the Federal Register under the previous sentence with respect to professional review actions of the entity commenced during the 3-year period beginning 30 days after the date of publication of the name.

---

[6] As noted above, at the hearing Fox submitted *Williams v. University Medical Center of Southern Nevada*, 2010 WL 668512 in support of his contention that he should have been given a hearing. In *Williams*, the doctor's conduct was in the context of specific patient medical care decisions, making it of little application here.

10

In other words, failure to report can result in a loss of the protections provided by HCQIA against damages claims, but only after an involved investigation by governmental authorities and publication in the Federal Register. The failure to report in a specific case does not automatically result in a loss of immunity in that particular case. *See Imperial v. Suburban Hosp. Ass'n, Inc*. 37 F.3d 1026, 1030 (4th Cir. 1994) (rejecting argument of automatic loss of immunity from failure to report in the plaintiff's case as "frivolous.")[7]

In his supplemental briefing, Fox asserts that he is not relying on the §11111(b) "exception" to immunity *per se*. Rather, Fox argues, defendants should be estopped from now contending that the suspension of his privileges is eligible for immunity under HCQIA when they previously took the position that it was not a reportable event under the statute. Fox has not shown that this gives rise to an estoppel, particularly given that the statute contemplates that hospitals will sometimes fail to report and provides a specific remedy for such failures.

### d. *Clark v. Columbia/HCA Information Services, Inc.*

Relying on the Nevada Supreme Court decision in *Clark v. Columbia/HCA Information Services, Inc*, 117 Nev. 468 (2001), Fox argues that HQCIA immunity cannot extend to his claims for retaliation, allegedly against his protected "whistle blowing" activities. The *Clark* court, however, expressly recognized that the facts before it were "unique." 117 Nev. at 478. The hospital in *Clark* based its revocation of the plaintiff's privileges *expressly* on his having made complaints to outside agencies, and *not* on any issue of patient care. *Id.*

If defendants here had suspended Fox's privileges specifically citing the conduct he contends was "whistle blowing," *Clark* would be relevant, though still not controlling, authority. As the stated basis of Fox's suspension was his failure to comply with the alternative coverage rule,

---

[7] The *Ricks* court listed the reporting requirement as one of the conditions for HCQIA immunity without discussing the further steps of an investigation by the Secretary and publication in the Federal Register. *See* 31 F.3d at 1485. As the reporting requirement was not at issue in *Ricks*, this appears to reflect a convenient shorthand for the Court,rather than a declaration that the provisions of Section 11111(b) are not applicable in this Circuit.

11

**No. C 04-0874 RS**
ORDER

*Clark* has no application here, except to the extent that even it recognized and acknowledged that where the only "evidence presented [is] of subjective biases or motives, [it does] not overcome the presumption of immunity." 117 Nev. at 478.

### e. Cal. Bus. & Prof. Code § 809

Finally, Fox contends his state law claims are not subject to HQCIA immunity because California exercised a right to "opt-out" of HQCIA by enacting California Business & Professions Code § 809, which governs peer review proceedings in this state. Section 11111 once included a provision that "Subsection (a) of this section shall not apply to State laws in a State for actions commenced on or after October 14, 1989, if the State by legislation elects such treatment." Congress, however, revoked that option in 1987. Whatever force California Business & Professions Code § 809 may continue to have in other settings, it does not serve to override HQCIA immunity now. Accordingly, for all of the reasons set out above, all defendants are entitled to immunity from damages in this action. As damages are a necessary element of all of Fox's claims, summary judgment in defendants' favor must be entered.

### 2. Antitrust and other issues

As an initial matter, Fox contends that most of the other grounds proffered by defendants as a basis for summary judgment constitute an improper request for reconsideration of the Court's October 9, 2007 order granting in part and denying in part a motion for partial summary judgment, and/or a March 17, 2005 order granting in part and denying in part a motion for judgment on the pleadings under Rule 12 of the Federal Rules of Civil Procedure. As to the prior Rule 12 motion, there is nothing that precludes a defendant from seeking to adjudicate by summary judgment issues that survived a Rule 12 motion. As to the prior summary judgment motion, new defendants have been added to the case since then who are entitled to seek summary judgment on any grounds they believe may be viable. While perhaps technically those defendants who were party to the prior summary judgment motion are thereby evading the usual restrictions on seeking reconsideration, if

summary judgment were proper on any of the grounds put forward, it would elevate form over substance to grant it only in favor of the new defendants, and to require the prior defendants to go to trial on meritless claims.

That said, upon review of the present record, no sufficient reason appears to depart from the prior rulings. The 2007 summary judgment order found that Fox had shown, albeit narrowly, the existence of sufficient triable issues of facts to support antitrust standing, an antitrust conspiracy, and a relevant geographic market. The Court concluded that beyond injury to himself, Fox had produced some evidence that the quality and availability of pediatric services at GSH suffered when his privileges were revoked. Although the inferences Fox sought to draw to support the existence of a conspiracy were "problematic," the timing of events precluded a conclusion as a matter of law that no conspiracy existed. Finally, Fox's reliance on a one-hospital geographic market was not fatal to his claims in light of the evidence as to how at least some patients obtain pediatric intensive care services, in an "after-market" upon entering GSH at the outset.

One main thrust of defendants' argument now is that despite the substantial additional written discovery and deposition practice that has taken place since the prior rulings, Fox cannot (defendants contend) point to any additional evidence to support his claims. To the extent that Fox does not have *more* evidence to support triable issues of fact, that does not somehow undermine the existence of triable issues of fact in the first instance.

Defendants are on more solid ground conceptually, however, when they argue that there is new affirmative evidence that refutes one or more of the Court's prior identifications of triable issues of fact. In this regard, defendants make four main points. First, defendants point to the deposition of Dr. R. Lawrence Berkowitz, who had previously offered a declaration that Fox's suspension "may have" impacted his ability to treat his patients, but who has now testified that there was no such negative impact. While the Court's 2007 order did expressly refer to the Berkowitz declaration as *one* example of "evidence that suggests a reduction in the quality of services to patients," resulting from Fox's suspension, it was not the sole evidence on which the Court rested its conclusion that triable factual issues existed. See October 9, 2007 Order at 9:2-12.

13

Second, and similarly, defendants point to the fact that Dr. Mendoza has now testified that he alone decided to withdraw his application for additional privileges, and that he was not pressured to do so by anyone else.   Again, the Court's 2007 order listed GSH's purported failure to approve such privileging applications as *one* example of evidence supporting an inference of conspiracy, but only one. See October 9, 2007 Order at 10:23-11:7.

Third, and to the same effect, defendants have now mounted a full-out assault on Fox's evidence that he was told "watch your back" after he had raised complaints about certain patient care incidents.  Although the statement may constitute inadmissible hearsay were it offered to support the existence of a conspiracy, taking it out of the equation does not result in a record devoid of any other evidence sufficient to create a triable issue of fact.[8]

Finally, defendants suggest that minutes of the Medical Quality Review Committee, recently produced over their objections, tend to show that Fox's complaints regarding patient care were actually taken as well-founded and addressed accordingly.  While that may be so, the fact that the Committee agreed with Fox's concerns does not rule out the possibility that he might have suffered retaliation for having brought the issues to light in the first place.[9]

As the parties are aware, the Court's 2007 Order included language suggesting that the evidence supporting triable issues of fact was not particularly strong in many respects, and expressly observing that "persuasive alternative inferences can be drawn."  In the present motion, defendants

---

[8] Defendants have filed a separate motion to strike regarding the "watch your back" statement, set to be heard on April 14, 2010. The Court has reviewed Fox's opposition to that motion, and agrees that the statement could be considered non-declarative, or non-hearsay, or otherwise admissible for certain limited purposes.  In none of those circumstances, however, would the statement be probative of the existence of a conspiracy. As this order reflects, however, ultimately it is of little consequence, because there is other evidence sufficient to create a triable issue.  More fundamentally, though, in light of the disposition of this order, the issue is moot.

[9] In one instance, the GSH Chief of Staff requested that Fox review a patient case.  Contrary to defendants' suggestion, however, the fact that the review process was initiated by GSH does not conclusively establish that Fox was not the victim of retaliation for his resulting report.  For example, Fox would be entitled to argue to a jury that defendants were unhappy that his report did not go far enough in attempting to defend or justify the patient care that had been given.

14

have perhaps kicked out a few more props supporting the case that the Court previously suggested was somewhat wobbly in the first instance. The Court's prior observations about summary judgment in the antitrust context, however, remain relevant.

> In overturning a summary judgment in an antitrust case, the Supreme Court noted "[s]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 500 (1969); see *In re Citric Acid Litigation*, 191 F.3d 1090, 1106 n.10 (9th Cir. 1999) ("[R]are is the antitrust case in which there is absolutely no evidence which could support some inference of an antitrust violation.").

October 9, 2007 Order at 7:10-16.

Defendants are of course correct that this does not mean summary judgment should never be granted with respect to antitrust issues. They have not persuasively shown, however, that it would be warranted here, were it not for HQCIA immunity.

### 3. Spoliation

Fox suggests that summary judgment should be denied based on his claim that defendants admit they destroyed certain records. Fox, however, has not established that any relevant documents were destroyed at any point in time when defendants should have been aware of their potential relevance. Nor has Fox otherwise shown that this would be a basis for denying summary judgment, particularly on the HCQIA immunity issue, to which any such destroyed documents would necessarily be irrelevant.

### 4. Rule 56(f)

Fox generally requests that a ruling on summary judgment be deferred pending further discovery. Even if Fox had adequately shown the potential relevance of further discovery to the substantive claims, there is no basis to believe that further discovery could possibly serve to create a material factual dispute regarding HCQIA immunity.

B. The HCA Motion

15

In a motion separately noticed and heard, defendant HCA, Inc. argues that regardless of the outcome of the motion brought by all the defendants, separate and independent grounds warrant summary judgment in its favor. The undisputed evidence, according to HCA, demonstrates that Fox cannot prove the sole allegation in the complaint previously identified by the Court as support for direct HCA liability, and that the circumstances do not warrant piercing the corporate veil to impose indirect liability. Because Fox fails to raise a material issue of triable fact, summary judgment for HCA will be entered on that additional and independent ground.

### 1. Additional Background as to HCA

Pertinent to this motion is the fact that defendant HCA acquired ownership of defendant GSH in 1995, some years after the earliest incidents giving rise to Fox's contention that he has suffered retaliation, but several years prior to his 2004 initiation of this action. Fox did not seek to add HCA as a defendant herein until March 31, 2006.

In 2008, HCA filed a motion to dismiss the operative second amended complaint, arguing, among other things, that the allegations did not support imposing direct liability on it for purported wrongdoing by GSH or other defendants. HCA expressly argued that under *U.S. v. Best Foods*, 524 U.S. 51, 64 (1998), Fox was obligated to plead (and ultimately prove) facts demonstrating that HCA, as a separate entity, was a "direct participant" in actionable conduct. HCA also argued that many of the alleged acts for which Fox sought to hold HCA directly liable were time-barred.

On October 30, 2008, the Court issued an order granting in part and denying in part HCA's motion to dismiss. The Court first found that Fox's claims against HCA did not "relate back" to the filing of this action, with the result that no conduct occurring prior to March 31, 2002 could serve as a basis for imposing liability against HCA.[10] The Court further found that Fox had alleged an adequate basis for imposing direct liability against HCA with respect to only one series of alleged

---

[10] The statute of limitations on Fox's federal claims is four years. The state law claims have a two year statute of limitations, such that only conduct occurring after March 31, 2004 can support those particular claims.

16

No. C 04-0874 RS
ORDER

events, namely, the "efforts to mandate what Fox characterizes as the 2006 non-negotiable HCA corporate loyalty oath." See October 30, 2008 Order at 7:21-22 (referencing Second Amended Complaint ¶¶ 37-39, 43, 58-59). The Court explained that because Fox had alleged facts supporting an inference that those efforts were undertaken by GSH's CEO William Piche *for the benefit of HCA* (albeit not the *sole* benefit of HCA), there was a sufficient basis to proceed against HCA as a direct participant in the alleged wrongdoing. The Court expressly declined to reach Fox's alternate theories of indirect liability.

### 2. Standards

The standards for summary judgment have been discussed above. In connection with this motion in particular, Fox's written opposition reflects a misapprehension of the relationship among motions to dismiss, motions for judgment on the pleadings, and motions for summary judgment. Fox correctly states that motions testing the sufficiency of a complaint, both motions to dismiss and motions for judgment on the pleadings, look only to what is contained within the four corners of the pleading (except where it is appropriate also to consider matters than can be judicially-noticed). Fox's apparent suggestion, however, that the contents of the complaint do not serve as a limitation at the summary judgment stage, is incorrect. While a summary judgment motion does go beyond the pleadings in the sense that it tests the sufficiency of the evidence to *support the allegations of the complaint*, those allegations still serve to frame—and limit—the issues.

For the same reason, Fox is not correct that HCA's motion should be deemed a motion for judgment on the pleadings simply because HCA's has focused on those elements of the complaint that survived the motion to dismiss. HCA does not challenge the sufficiency of the *allegations* to state a claim; it has, for purposes of this motion, accepted the Court's prior rulings in that regard. Rather, HCA is now contending that the *evidence* establishes as a matter of undisputed fact that Fox is unable to *prove* any of the allegations of the complaint that the Court previously found would support imposition of liability against HCA, *if proven.*

17

Thus, in either a motion to dismiss or a motion for judgment on the pleadings, the allegations of the complaint are presumed true, and the only question is whether those allegations would support liability. At summary judgment, however, the question is whether the *evidence* "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The question is *not* whether there are other unpleaded facts or theories which might support liability.[11]

### 3. The evidence

Much of Fox's opposition is devoted to establishing that William Piche, the CEO of GSH was also an HCA employee, as was former CEO Thomas May, who is Piche's superior, and who remains an officer of GSH's general partner. From these facts, Fox contends, it can be inferred that *any* alleged wrongdoing by either Piche or May can be ascribed to HCA, or at least there is an issue of fact as to which "hat" these individuals were wearing at the time. These arguments, however, were considered and rejected in the context of the prior motion to dismiss. As reflected in the October 30, 2008 order, without facts supporting an inference that the challenged conduct was undertaken for the benefit of HCA, Fox cannot overcome the presumption that an individual is wearing the "hat" of the subsidiary when conducting the business of the subsidiary. See *Best Foods*, 524 U.S. at 69-70.

Applying that principle, the Court previously concluded that the only non-time-barred matters alleged in the second amended complaint that could fairly be ascribed to HCA was the alleged imposition of the "loyalty oath." Even assuming it were appropriate for the Court now to revisit the question of whether other matters, such as Piche's involvement in Fox's privileging between 2002 and 2004, theoretically could support direct liability against HCA, Fox has not

---

[11] This is not to say that factual details beyond those explicitly set out in a complaint are out of bounds at the summary judgment stage, so long as those details do not represent new or different grounds for asserted liability beyond those properly noticed by the complaint. Fox is also correct that Rule 15 provides a mechanism for filing a supplemental complaint, to bring in conduct taking place after the date of the operative pleading. Fox has not sought leave to file a supplemental complaint, however, and the theoretical possibility that one could be filed is not a basis for considering post-complaint conduct in evaluating this summary judgment motion.

18

**United States District Court**
For the Northern District of California

1 pointed to any further facts or evidence giving rise to an inference that Piche was acting for the

2 benefit of HCA in such matters.

3 Furthermore, regardless of which hat Piche or May was wearing, Fox cannot avoid summary judgment by pointing to purported factual issues related to conduct occurring prior to March 31, 2002 (four years prior to the time HCA was added as a defendant herein) or after the then-proposed second amended complaint was filed on April 18, 2008. Accordingly, HCA's focus on the issue of the "loyalty oath" as the dispositive question is appropriate.

On that point, HCA has produced undisputed evidence that defendants withdrew any requirement for Fox to sign the "loyalty oath" as a condition for obtaining privileges, and so informed Fox by letter dated May 25, 2006. Declaration of Carol Ostermann, Exhibits B & C.[12] The same letter informed Fox that his application for reappointment would be presented to the next meeting of GSH's Board of Trustees, with a recommendation that it be approved. Ostermann Decl., Exh. C. Fox's application for privileges was in fact granted at that meeting. Declaration of William Piche, Exhibit B.

Fox does not dispute these facts. Instead, Fox points out that GSH failed thereafter to send him written notice that his reappointment had been approved. Defendants contend this was mere administrative "oversight," but Fox argues that in light of the entire history between him and GSH, there is a reasonable inference that it was the result of further retaliation. The shortcoming in this argument is that it at most might create an issue of fact as to whether *GSH* wrongfully withheld formal notification of Fox's reappointment. As the Court's October 30, 2008 order indicated, there may have been a reasonable inference that imposing the requirement of the "loyalty oath" was an act that benefited HCA, but once that requirement was lifted, any connection to HCA was severed. Fox does not dispute he received notice that no "loyalty oath" to HCA would be required. Any subsequent failure to notify Fox of his reappointment was no more an act on behalf of HCA than

---

[12] Indeed, it appears that the GSH Medical Executive Committee eliminated the "loyalty oath" requirement precisely because it agreed with Fox's objections to it. The committee minutes state: "A physician's objections to language in the Confidentiality and Security Agreement were reviewed and found to be valid." Ostermann Decl., Exh. B.

19

any of the other matters involving Fox's privileging that the Court has found do not support direct liability against HCA. Accordingly, summary judgment in favor of HCA on all of Fox's direct liability claims is warranted.[13]

Finally, HCA's motion set forth evidence and argument that there is no basis to impose indirect liability against it under an alter ego theory. Fox's opposition elected not to offer any evidence or argument to the contrary, resting instead on his assertion that direct liability exists. Accordingly, summary judgment in favor of HCA on the indirect liability claims is also appropriate.

## IV. CONCLUSION

Defendants' motions for summary judgment are granted. A separate judgment will be entered.

IT IS SO ORDERED.

Dated: 03/29/2010

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

---

[13] Fox's suggestion that the matter be continued under Rule 56(f) to permit further discovery fails to show with adequate specificity what further discovery might accomplish.